UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
DERIVIUM CAPITAL LLC,

                      Appellant,                    05 Civ. 10845 (CLB)

                  - against -           Bankruptcy Case No. 05-37491 (CGM)

UNITED STATES TRUSTEE,

                                  ***Memorandum and Order***

                    Appellee.

--------------------------------------------------------x
IN RE:

DERIVIUM CAPITAL LLC,

                    Debtor.
--------------------------------------------------------x
Brieant, J.

      Appellant Derivium Capital, LLC ("Derivium" or "Debtor") appeals from a November 4,

2005 Order of United States Bankruptcy Judge Cecelia G. Morris, which converted the Debtor's

Chapter 11 bankruptcy proceeding into a Chapter 7 case.  On March 13, 2006, four loan

borrowers from Derivium ("Borrowers") filed a motion (Doc. 25) seeking leave to join Debtor's

appeal or to file an *amicus* brief.  Counsel for all parties appeared before the Court for oral

argument on March 22, 2006.


      The following information appears of record and is not disputed, except as noted below.

Derivium began business in 1997 under the name of First Security Capital, LLC, and offered a

financial product claimed to be proprietary, which it called a "90% Stock Loan," by which

transaction a borrower would pledge certain eligible publicly traded stock to secure a non-

recourse loan in the amount of 90% of the market value of the stock. The loan would typically mature after three years with interest accruing at 10% to 12% per annum. At maturity, the borrower had the choice either to pay the amount due on the loan with interest and the Debtor would return the stock pledged, or, if the value of the stock was less than the loan principal plus interest, the borrower could walk away from the transaction without any further obligation. A borrower could also sometimes extend the loan period by agreement. Derivium apparently did not itself fund the loans, but merely sold the product and arranged for funding originally by an Irish corporation named Diversified Design Associates, and subsequently by Bancroft Ventures, Ltd. ("Bancroft"), an Isle of Man corporation located in Cyprus.

The lure by which the product was sold, was as a tax shelter. By entering into the transaction, as opposed to merely selling his stock at 100% of market value, the borrower could convert short term capital gain to long term gain, and postpone the recognition of the tax until the end of the loan period. Derivium approved each stock transaction, rejecting those involving thinly traded or highly volatile issues. Few blue-chip stocks appreciate more than thirty percent in value over a three year period. Even if a particular issue did so, the borrower, upon redeeming, would get the stock back at his original basis. Accordingly, there was little expectation that any borrower would ever redeem his stock at the end of the loan period.

From the period of 1998-2002, Derivium marketed approximately 1,700 loan transactions, in total worth approximately $1 Billion, and generated commissions (the 10% up-front discount) to Derivium of approximately $22 Million. The stock was sold in most cases

shortly after receipt by the Debtor or the Debtor's off-shore lender, without consulting the Borrowers, and Debtor asserts that in doing so it acted under the direction of its then-lender, Bancroft. The Debtor entered into hedging transactions, mostly in real estate investments, relying on profits for the ability ultimately to return the stock to those clients at the end of the loan term, who might seek to repay the loan. Administrative overhead and sales commissions exceeded the immediate 10% economic benefit flowing to the Debtor when the transaction was booked. Debtor, in order to earn enough to remain solvent, claims it had a proprietary hedging program for investing which its lender controlled.

As might be expected, and as discussed *infra*, the Internal Revenue Service ("IRS") commenced an investigation into the Debtor's business in 2004, and in letters sent by the IRS to borrowers under the program, it indicated that it believed, among other things, that the borrowers' stock pledged to Derivium was sold *before* the borrowers received their funds, and that the proceeds were actually the source of the funds Derivium then loaned to the borrowers. The IRS has taken the litigation position that the sales were closed transactions for tax purposes in the year the loan was made.

Debtor ceased doing business toward the end of 2001 because of litigation brought by the State of California's Corporations Commissioner ("California") against Debtor and related defendants. California sought to enjoin Derivium from marketing the 90% Stock Loan, claiming *inter alia* : 1) that the transactions were sales of securities and thus required a broker/dealer license under California Corporations Code §250210 (a); and 2) that the Debtor acted as an

3

unlicensed finance lender or broker in making consumer or commercial loans in violation of California Finance Lenders Law.

On November 5, 2003, the Superior Court of California, County of Sacramento, granted summary judgment to Derivium on the issue of whether the transactions constituted sales rather than loans pursuant to the Corporations Code, and concluded that Derivium's 90% Stock Loans were bone fide loans. It denied summary judgment to Derivium on the question of whether Derivium acted as a broker without a license for a finance lender making consumer or commercial loans, in violation of the Financial Code. *See App. 109 -114.* The Superior Court of California noted that while "the immediate liquidation of the security may have many untoward impacts upon the parties to the transaction, those potential impacts have no apparent relevance to the bone fide nature of the primary transaction." *App. 110.* The Superior Court found that the "Commissioner has presented no authorities to support the proposition that a pledgee of [fungible] stock as security, or its agent, cannot liquidate the pledged securities absent a default, or that the fact of such liquidation affects the bona fide nature of the secured transaction" and that "[i]n the end, [Derivium's] initial contention that the transaction were loans was the only position supported by evidence in the record." *App. 110, 112.* Obviously, these legal conclusions are not binding on the IRS.

Debtor asserts that notwithstanding the Superior Court's finding that the transactions were true loans, the pendency of the litigation had a devastating effect on Derivium's business, including necessitating the total cessation of business activities in California since late 2001, and

4

the termination of its relationship with its source lender, Bancroft, which was named as a party to the California action. In December 2002, Derivium and Bancroft executed a termination and settlement agreement in which Bancroft agreed to indemnify Derivium for claims asserted by any borrowers under the 90% Stock Loan program.

In 2003, Derivium became the subject of lawsuits in various states instituted by a number of borrowers seeking to redeem their stock upon loan maturity. Upon election by the borrowers to receive back the number of shares pledged, Derivium could not perform, Bancroft did not perform and the borrowers instituted suit. Debtor asserts that due to Bancroft's failure to honor its indemnification agreement, Debtor has been found liable in several arbitration awards totaling approximately $75 million.

In December 2004, the IRS issued information document requests followed by summonses, seeking information about the Stock Loan program as part of a Section 6700 investigation. The IRS notified certain known borrowers, including the Borrowers seeking to intervene in this appeal, of their possible liability for capital gains taxes and penalties, should a determination be made that the transactions were sales of securities at the date made rather than bone fide loans. On October 15, 2005, the IRS commenced an action in the United States District Court for the Southern District of New York against Charles Cathcart, Ph.D., Managing Director of Derivium, seeking to enforce the summonses. In its court filings, the IRS disclosed that the Section 6700 investigation could result in the assessment of civil penalties against the Debtor, tax liabilities to the Borrowers, and a requested injunction from marketing the 90%

Loan.        On September 1, 2005, Derivium filed a voluntary petition under Chapter 11 of the United States Bankruptcy Court for the Southern District of New York.  Debtor claims that the actions in California and by the IRS, as well as the loss of Bancroft as its sole lending source, forced it to shut down its business and precipitated its filing for relief under Chapter 11 of the Bankruptcy Code.  Derivium claims it was forced to cease operations until it could obtain a final determination as to the legitimacy of the 90% Stock Loan program and thereafter secure a new lending partner, while obtaining a reprieve from the customer litigation. The Debtor's stated intention as a Chapter 11 Debtor was the filing of a motion pursuant to 11 U.S.C. §505, to obtain a determination that the transactions were actually bone fide loans and not securities sales, which determination would enable the Debtor to resume its operations, but this was never done.

On September 21, 2005, five (5) days after the September 16, 2005 date by which Derivium's Schedules and Statement of Financial Affairs were due to be filed under 11 U.S.C. §521 and the Federal Rules of Bankruptcy Procedure 1007(b), the United States Trustee for the Southern District of New York ("US Trustee") filed a motion to convert the Chapter 11 case to a Chapter 7 case, or to dismiss the Chapter 11 case ("Motion to Convert"), claiming that the delayed filing "demonstrate[d] bad faith and an unreasonable delay that is prejudicial to creditors, which constitutes cause to convert or dismiss this case pursuant to 11 U.S.C. §1112(b)" and that the "failure to file schedules of assets and liabilities and statements of financial affairs and executory contracts independently constitutes cause to convert or dismiss the case pursuant to 11 U.S.C. §1112(e)." *App. 19.*  On October 27, 2005, the U.S. Trustee filed a Supplemental Memorandum of Law and Statement in Further Support of the Motion to

Convert.

On November 3, 2005, the Bankruptcy Judge held a hearing by way of telephonic conference call on the Motion to Convert. On November 4, 2005, Judge Morris entered an order for conversion ("Conversion Order") of Debtor's Chapter 11 case to a Chapter 7 case, finding that cause existed for the relief requested, and specifically relying on all the following factors: 1) Debtor's lack of insurance; 2) Debtor's lack of profit during its pre-petition period of operation; 3) Debtor's inability to effectuate a plan; 4) Debtor's failure to timely file [a] monthly financial statement, which when filed was not signed, verified, or prepared in compliance with the U.S. Trustee's Operating Guidelines; 5) Debtor's failure to provide the United States Trustee with a requested sworn statement regarding the amounts paid to the Debtor's principals (Debtor furnished only an attorney's letter); 6) The representation of the Debtor-in-possession by professionals retained without approval by the Court, in contravention of the bankruptcy laws; 7) Debtors's improper inclusion of an insider in the list of the twenty largest creditors filed with the Court; 8) A pattern of delay, including the untimely filing of schedules and the list of creditors, and the Debtor's principal being out of the country on the date of the Section 341(a) meeting; 9) The debtor's pattern of making determinations without required Court involvement, including the untimely filing of schedules without seeking an extension of time; the Debtor's principal making the decision to not appear at the initial Section 341(a) meeting without seeking leave of Court; and the representation of the estate [in South Carolina] by professionals not retained by Court order; 10) Debtor's failure to pay required quarterly fee pursuant to 28 U.S.C. §1930(a)(6); and 11) Debtor's failure to adequately account for the $20 to $25 million in

commissions allegedly earned during its pre-petition operations. The Bankruptcy Court also concluded that the arguments of the Debtor-in-possession were not compelling because it has failed to file any documents with the Court to retain tax counsel, to seek a determination of tax liability under 11 U.S.C. §505 or to seek approval of its purported financing during the pendency of the Chapter 11 case. *See App. 153-155.*

On the same day, November 4, 2005, the Bankruptcy Court also entered an order transferring venue to the District of South Carolina upon the motion of Mr. Richard Sabelhaus, the Chairman of the Creditors Committee. The transfer order is not apparently challenged although as discussed *infra*, the U.S. Trustee challenges this Court's current jurisdiction over this appeal, following the Bankruptcy Court's transfer of the case to South Carolina.

On November 7, 2005, Kevin Campbell was appointed as the Chapter 7 Trustee by the Bankruptcy Court for the District of South Carolina. According to Mr. Sabelhaus' counsel, two out of three members of the Creditors Committee supported the conversion to a Chapter 7 proceeding. The Chapter 7 Trustee, Mr. Kevin Campbell, requests that the Court dismiss the appeal or affirm the order converting the Debtor's case into a Chapter 7 case.

Appellants moved timely for reconsideration of the Conversion Order under Rule 60(b) of the Federal Rules of Civil Procedure ("FRCP") for "mistake, inadvertence, surprise or excusable neglect" or "any other reason justifying relief." A telephonic conference call on the motion was conducted on November 29, 2005. On December 1, 2005, Judge Morris entered an

order denying the motion for reconsideration, finding that the Debtor did not make the requisite showing that the Court either based its decision on a misapprehension or mistake of fact, that it overlooked material facts, or that the Debtor's failures properly to comply with the requests of the U.S. Trustee, certain provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, constituted excusable neglect.

Debtor appeals the Conversion Order and the denial of Reconsideration, arguing that the Bankruptcy Court erred in the following ways: 1) by finding that Derivium engaged in a pattern of delay; 2) by finding that Derivium is unable to effectuate a plan of reorganization; 3) by finding that Derivium failed to earn a pre-petition profit; 4) by finding that Derivium failed to adequately account for the $20 to $25 million in commissions earned by the Debtor during its pre-petition operations; 5) by finding that Derivium failed to pay the quarterly fee pursuant to 28 U.S.C. §1930(a)(6); 6) by finding that Derivium failed to provide a sworn statement concerning amounts paid to Derivium's principals pre-petition; 7) by finding that Derivium failed to file documents with the Court to seek a determination of tax liability; 8) by finding that Derivium's "inadvertent inclusion" of an insider on the list of twenty largest creditors, which was "promptly amended upon notification of the mistake by the U.S. Trustee," constituted cause for conversion; 9) by abusing its discretion in finding cause to convert the Chapter 11 case to one under Chapter 7; and 10) by misapprehending material facts or basing the conversion to a Chapter 7 case upon factors constituting excusable neglect or inadvertence, such that it was reversible error not to grant Derivium's motion for reconsideration. Appellant Debtor argues that conversion was not in the best interests of the creditors, that the Bankruptcy Court made manifest erroneous findings

of fact, and that the Bankruptcy Court rushed to judgment in converting a Chapter 11 Debtor, which imperfectly, but nevertheless diligently and in good faith, prosecuted its case for reorganization, which it could have effectuated, if given the chance.

*Jurisdiction of this Court following Bankruptcy Court's Transfer of Venue to South Carolina*

The U.S. Trustee argues that this appeal should be dismissed because jurisdiction over the appeal of the conversion order is now solely in the United States District Court for the District of South Carolina, following the Bankruptcy Court's transfer of venue to that district.[1] The U.S. Trustee argues that the longstanding general rule in this Circuit is that the transferee court has jurisdiction over appeals of orders entered prior to transfer, citing to *In re: Adelphia Communications Corporations Securities and Derivative Litigation*, 03 MDL 1529, (S.D.N.Y. 2003) (McKenna, J.).  In that opinion, Judge McKenna cited to and relied upon *Magnetic Engineering & Mfg. Co. v. Dings Mfg. Co.*, 178 F.2d 866, 870 (2d Cir. 1950), in which Judge Learned Hand held that "[t]he review of any order of the district court in a transferred cause, made before transfer, is within the jurisdiction of the court of appeals of the circuit to which the cause has been transferred."  In so holding, the Court of Appeals held that a component of a Southern District of New York District Court order, which transferred the case to the Eastern District of Wisconsin, was reviewable by the by the Seventh Circuit Court of Appeals.  In that same decision, however, Judge Hand stated that the District Court's order "[i]n so far as it denied the temporary injunction, [] was of course appealable, and it [was properly before the Second

---

[1] The Debtor apparently also filed a timely notice of appeal in the U.S. Bankruptcy Court for the District of South Carolina, but did not ultimately perfect that appeal, which, upon motion of the U.S. Trustee, was dismissed without prejudice by the U.S. District Court of South Carolina.

Circuit Court of Appeals] on the merits." *Id. at 868.*  In determining the propriety of its review as the appellate court of the transferor court, it appears that the Court of Appeals found a determinative difference in whether the order was substantive or procedural.

The Court does not agree with the U.S. Trustees' contention that a District Court of the Southern District of New York is divested of appellate jurisdiction over a Southern District of New York Bankruptcy Court Order, because the Bankruptcy Court transferred venue immediately after entering the Conversion Order.  The Bankruptcy Court's Conversion Order and Denial of Reconsideration are substantive decisions, over which this District Court has appellate jurisdiction.  Title 28 of the U.S. Code provides that "[a]n appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving." *28 U.S.C. §158(a)(3).*  Accordingly, the Southern District of New York is not divested of appellate jurisdiction over a Conversion Order entered by the Bankruptcy Court of this District,

simply by a subsequent transfer of venue. But for that rule, a vast area for forum shopping would come into existence.  The motion to dismiss this appeal on jurisdictional grounds is denied.

*Borrowers' Motion to Join Debtor's Appeal or file an Amicus Curiae Brief*

The Borrower-movants[2] are four of approximately 1,700 borrowers under the 90% Stock Loan program.  They seek leave to join Derivium's appeal, contending that they are directly and adversely impacted by the conversion of Derivium's Chapter 11 proceedings into Chapter 7

---

[2] Katherine Collings, Mark Parent, Alan Schreiber, and Dorairaju Thavaseelan are the named Borrowers and Movants in the Order to Show Cause.

proceedings. In the alternative, they seek leave to file an *amicus curiae* brief.

The Second Circuit has adopted the general rule that "in order to have standing to appeal from a bankruptcy court ruling, an appellant must be a 'person aggrieved' – a person 'directly and adversely affected pecuniarily by the challenged order of the bankruptcy court.'" *International Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991) (citations omitted). "[P]ersons aggrieved" have a general right to appeal and need not formally intervene to preserve that right." *Id. at 748.* The Borrowers seeking leave to join the appeal did not appeal timely the Conversion Order independently because they did not receive IRS notifications until February 2006, and by this Order to Show Cause, they do not seek to institute a new appeal, but rather to join in or intervene in Debtor's appeal.

The Conversion Order prevents Derivium from acting as a Debtor-in-Possession, so it has thereby become unable to challenge the IRS' determination that the 90% Stock Loan Program transactions were not true loans, and that the borrowers are liable for capital gains taxes as of the date of the loan or sale of their stock by the pledgee. The Borrowers argue that they are aggrieved because they have now received notices from the IRS of the IRS' belief that the transactions were sales rather than loans, and that they may therefore be liable for capital gains taxes and penalties. They argue that their interests can only be adequately served by Derivium's challenge to the IRS allegation, in part because the Borrowers would not be able adequately to challenge many of the factual assertions made by the IRS, such as the IRS' preliminary allegation that: "Derivium sold the stock in order to fund the transaction. Derivium did not fund

the transaction until you had transferred the stock to it." *Kaufman Decl*. ¶27.

The IRS letters state the Government's conclusion that the Derivium transactions constituted sales in the initial year of each transaction, that the sales price was the amount at which Derivium sold each Borrower's stock, and that each Borrower's gain from the sale of stock was the sales price less the Borrower's basis. The Borrowers have been directed by the IRS to file amended tax returns and to execute forms to extend the time to assess tax liability. The IRS and presumably state taxing authorities are currently or will be imminently assessing capital gains taxes and related penalties against the Borrowers.

Counsel for the Borrowers represented to this Court that they are unaware of whether all Derivium transactions were conducted in the same manner, and it is conceivable that loans to some Borrowers were funded from pre-existing resources of either Derivium or Bancroft, while loans to other Borrowers were funded from the sale of the very stock which those Borrowers pledged under the 90% Stock Loan program. The assertion of the IRS to at least several of the Borrowers that their stock was sold prior to their receipt of loan money illustrates that the issue of whether the loan money distributed to each Borrower was obtained by the lender's sale of that Borrower's own stock, may be a substantially determinative fact issue going to a Borrower's potential tax liability, although it should not be, in this Court's view.

While the Borrowers would be entitled individually to obtain evidence of the facts surrounding their own loans, and would enjoy this right whether or not the case were converted,

13

they undoubtedly have a substantial interest in seeking a single comprehensive determination of the validity of the loans *qua* loans and of the resulting tax implications. Clearly, there is substantial practical advantage to obtaining a unified and comprehensive determination on that question by way of Derivium's pursuit of a Section 505 determination in the context of a Chapter 11 reorganization proceeding. Without such a comprehensive determination, the Borrowers are necessarily left to individually pay or contest the IRS's assessments of liabilities against them.

Neither the United States Trustee nor the Chapter 7 Trustee is prejudiced by the grant of leave to intervene, as no separate appeal or review of the Conversion Order is requested. Accordingly, this Court grants leave to the Borrowers to join in or intervene in the appeal, *nunc pro tunc,* their arguments having already been heard on the record.

*The Conversion Order*

This Court reviews an order converting a bankruptcy case for cause, for an abuse of discretion. *See In re: Blaise*, 219 B.R. 946 (2d Cir. B.A.P. 1998). The standard of review of a bankruptcy order denying reconsideration is the same. *National Petrochemical Co. v. The M/T Stolt Sheaf*, 930 F.2d 240, 244 (2d Cir. 1991). A Bankruptcy Court's findings of fact are reviewed for clear error. *Federal Rules of Bankruptcy Procedure ("FRBP") 8013.*

The United States Bankruptcy Code provides, in pertinent part, that any one of the following factors may be considered cause for the conversion or dismissal of a Chapter 11 case:

1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;
2) inability to effectuate a plan;
3) unreasonable delay by the debtor that is prejudicial to creditors;

*      *      *      *

10) nonpayment of any fees or charges required under chapter 123 of title 28.

11 U.S.C. §1112(b).  "'The list contained in § 1112(b) is not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.' House Report No. 95-595, 95th Cong., 1st Sess. at 405-6."  *C-TC 9th Ave. Pshp. v. Norton Co. (In re C-TC 9th Ave. Pshp.)*, 113 F.3d 1304, 1311, n.5 (2d Cir. 1997).

The Bankruptcy Court based its decision to convert this case on the totality of the circumstances earlier listed.  The Debtor challenges several of the Bankruptcy Court's factual findings as clearly erroneous, asserting the following facts and arguments in contrast to the Court's findings of inexcusable bad faith delays and other findings.

Debtor challenges the Bankruptcy Court's finding of a pattern of delay as to the filing of schedules, list of creditors, and Dr. Cathcart's absence from the October 12, 2005 conference.  It argues that the five day delay in submitting Schedules was not unreasonable or prejudicial to creditors.  Debtor asserts that on September 23, 2005, two days after the U.S. Trustee made her Motion to Convert and Derivium filed its Schedules, Dr. Cathcart appeared before the Trustee in response to a request for an initial debtor interview ("IDI"), and answered questions about the Debtor's business and financial affairs and the events precipitating the Debtor's filing for relief and plans for reorganization, including evidence of a newly established Debtor in Possession

("DIP") bank account, in compliance with the U.S. Trustee guidelines.

Debtor asserts that Dr. Cathcart could not attend the First Meeting of Creditors on October 12, 2005, because he was attending a long-scheduled business meeting in China with the party that Derivium hoped to secure (and ultimately did secure) as a new lending partner and source of Chapter 11 financing. The U.S. Trustee denied Derivium's request for consent to a short adjournment of the meeting and subsequently the Bankruptcy Court denied Derivium's follow-up motion for an adjournment. In Dr. Cathcart's absence, Derivium provided Yuri Debevc, a Director of Derivium and 25% owner, who was primarily responsible for administering the loans arranged by Derivium. The meeting was continued to October 21, 2005, on which day Dr. Cathcart was present and provided about 4 hours of testimony regarding the Debtor's business and financial affairs. Dr. Cathcart had also appeared before the Bankruptcy Court on October 18, 2005, in connection with an initial case conference scheduled by the Court.

The findings of delays, even if more formally scrutinized than they might normally be in this district, are not clearly erroneous. Debtor admits, for example, that the schedules and statements of financial affairs were filed five days late. Although this Court might not classify this and the other delays as constituting a prejudicial pattern of delay, this Court cannot say that the finding concerning the delays was clearly erroneous. *See Healey v. Chelsea Resources, Ltd.*, 947 F.2d 611, 619 (2d Cir. 1991) ("The decision as to whose testimony to credit and as to which of competing inferences to draw was within the province of the district court as trier of fact.").

Debtor also argues that it was able to effectuate a plan of reorganization and that there was pre-petition a thriving business prospect in the stock loan product which had generated over a billion dollars of loans in a short period of time and approximately $20 to $25 million in commissions. It argues that Dr. Cathcart testified that going forward the company would operate differently, without the same overhead costs and that there would be fewer commissioned salespeople because the company would go directly to brokerage houses. Dr. Cathcart testified that the lack of profitability was based on the fact that there were substantial overhead expenses that reduced the net return.

The assertion of different conduct intended for the future, even if legitimately stemming from lessons learned, does not negate a finding of a lack of meaningful pre-petition profit success, especially in this case in which Debtor's tax returns reveal from 1998 to 2002, a cumulative loss of $2,461,799.00. This Court is not persuaded by the argument that there is some proprietary value to the Debtor's design or plan of stock pledges and loans, or its investment practices concerning the proceeds. As a matter of law, the business conducted by Derivium could have been conducted by anyone,. Also, Appellant's brief explains the distribution only of approximately $16 - 17 million of the estimated $20 to $25 million in receipts. Debtor argues that any deficiencies of explanation are in part due to the fact that the Debtor hasn't had access to all of the books and records, which are under court order in South Carolina. The Court again cannot find clear error in the Bankruptcy Court's finding of a failure to explain sufficiently and adequately what became of the earnings of Derivium during its operations.

Debtor argues that within a month or month and a half of its filing a Chapter 11 bankruptcy proceeding, it was able to secure the means to finance the litigation with the IRS pertaining to the validity of the loans upon which its survival depends. On Oct. 18, 2005, Dr. Cathcart advised the Bankruptcy Court of several developments regarding its Chapter 11 reorganization, including its agreement with a proposed lender to fund the §505 tax determination action (and that a sum of $130,000 was advanced to proposed counsel, Mr. Edward Ord, of the law firm of Ord and Norman). Derivium argues that the funds were to be held in trust for Mr. Ord's services, pending Court approval. During that conference, counsel for Derivium informed the Bankruptcy Court that "Mr. Ord is a tax specialist and, with Court approval, will become engaged to address the debtor's tax issues, which were mentioned in our filing papers." *Tr., Oct. 18, 2005 at 5.*

The Court acknowledges Debtor's verbalized deference to the Bankruptcy Court's approval of an attorney to litigate the tax issue during the conference call, but also notes that the retention funds were already advanced, and this Court cannot find clearly erroneous the Bankruptcy Court's finding that Debtor failed properly to receive approval of the Court *prior to* retaining or attempting to retain counsel to execute the Section 505 litigation.

Appellants also argue that the Bankruptcy Court Judge failed to appreciate the implications of the conversion and its effect on the IRS determinations as to whether the transactions were loans or sales, as well as Derivium's unusual position as a Chapter 11 estate in a holding pattern, with no assets depreciating or employees bleeding the company of cash. It

claims its only significant expenses would have been costs related to the tax determination matter, which would have been borne by a third party, who was willing to fund that litigation with a prospective plan to be a new lender for the loan marketing business.

This Court agrees that the parties share an interest in seeing the tax determination successfully prosecuted to their hoped for determination that the 90% Stock Loan is a bona fide loan and not a sale of a security, as well as the determination as to whether the IRS or a state taxing authority is prior over the Borrowers and other unsecured creditors. The Debtor's interest is in saving its business and the Borrowers have an interest in avoiding capital gains taxes and penalty interest accumulations. The Debtor argues that a Chapter 7 Trustee, has no similar interest or incentive, and by implication argues that the Chapter 7 Trustee is unlikely to use limited resources to achieve such a determination. The Court notes Derivium's argument that the outcome of an IRS' audit spanning the years 1998, 1999, and 2000, resulted in no Section 6700 investigation or challenge to the 90% Stock Loan, and that this further indicates the likelihood of prevailing on the merits of a tax determination. While the outcome of the audit and the limited success in the California Court might seem to bode well for Derivium, neither precludes a different outcome of an actual Section 6700 investigation at this later date, based on further developed evidence of the business practices and procedures employed by Derivium, and the IRS will not be bound by such a conclusion. The Chapter 7 trustee, if so advised, and with the approval of the supervising Bankruptcy Judge remains free to litigate some or all of these issues with the IRS just as the Debtor-in-Possession would be.

The Bankruptcy Court stated in the Conversion Order that "the arguments of the debtor-in-possession are not compelling, in that it has failed to file any documents with the Court to retain tax counsel, to seek a determination of tax liability under §505 or to seek approval of its purported financing during the pendency of the Chapter 11." *See App. 154.* The Bankruptcy Court did not abuse its discretion in concluding that the likelihood of success and viability of the company arguments were not sufficiently compelling to render a different outcome on the question of conversion. Indeed, this Court agrees with the Bankruptcy Judge that there is little or no feasibility here for a successful Chapter 11 reorganization of this Debtor. So long as the IRS

dispute remains undecided, Derivium cannot do business or reorganize. If it is resolved in the Debtor's favor, anybody, as noted earlier, can sell the financial product offered by Derivium, including new entries in the market not burdened by prior losses, debts, legal fees and pending customer litigation. While the definition of an abusive tax shelter is elusive, generally a pre-packaged transaction which is sold as a tax shelter, which no rational person would enter into but for non-economic (tax) considerations, is likely to be found by the courts to be an abusive tax shelter. In this case, the buyer of the financial product is selling an asset for 10% less than its market value with a right to redeem which is of illusory value. A court may well find tax consequences the sole motivating factor. In so finding, a court may conclude reasonably that the Derivium loan constituted "mere formalities designed to make the transaction appear to be other than it was in order to avoid tax liability," quoting *Commissioner of Int. Rev. v. Court Holding Co.*, 324 U.S. 331, 333 (1945), i.e. a loan rather than a sale, and that "the incidence of taxation depends upon the substance of a transaction" *Id.* at 334. *See also Raymond v. United States*, 355

F.3d 107, 108 (2d Cir. 2004) (substance rather than form determines tax consequences); *Green v. United States*, 13 F.3d 577, 581 (2d Cir. 1994).

This Court recognized that under the unusual facts of this case the Borrowers' interests are closely aligned with those of the Debtor insofar as concerns the claims of the IRS. The Borrowers can be considered for current purposes to be unsecured creditors. Whether the IRS or unsecured creditors will enjoy priority is naturally a concern of the Debtor and the Borrowers. There is a public policy preference in favor of a Debtor-in-possession remaining as such, and in a Chapter 11 context, it is possible but by no means certain that the parties could, together, litigate more favorably with the IRS. Notwithstanding this valid argument, on the totality of this record, and faced with all of the acts and failures to act, the Bankruptcy Judge did not abuse her discretion in ordering conversion. Not disputed by the Appellants are the lack of insurance coverage, failure to seek Court approval prior to appointment of professionals, and failure to seek extensions of time. In addition to the failure to adhere to deadlines, the fact that the Debtor is not operating and cannot do so in the near future, which in turn makes reorganization impractical,

supports the Bankruptcy Court's decision to covert the case.

Finding no abuse of discretion, the Conversion Order is affirmed.

*Motion for Reconsideration*

In the telephone conference conducted on the motion for reconsideration, Debtor's

counsel communicated that certain of the facts relied upon by the Court were either incorrect or the result of an inadvertent mistake or misunderstanding. Acknowledging that the Debtor did not know which factors weighed more heavily in the Bankruptcy Court's decision, it argued that "the most substantial ones deserve reconsideration." *See App*. 255.

The Bankruptcy Court did not abuse its discretion in denying reconsideration. The transcript of the telephonic conference on the motion reveals that the Bankruptcy Judge was understandably not satisfied that there had been actual misunderstandings of fact or mistakes warranting Rule 60 Reconsideration.

Finding no abuse of discretion, and concluding that there were no material misunderstandings on the part of the Bankruptcy Court, this Order appealed from is affirmed.

## **Conclusion**

The motion to intervene is granted. The Order appealed from is affirmed in all respects.

X

      X

          X

SO ORDERED.

Dated: White Plains, New York
       May 12, 2006

_____
Charles L. Brieant, U.S.D.J.